IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STONY BATTERY RD : <br> PROPERTY OWNER LLC, *et al.*, : <br> Plaintiffs, : <br> : <br> v. : <br> : <br> QVC, INC., : <br> Defendant. : | Civil No. 5:23-cv-00518-JMG |

**MEMORANDUM OPINION**

**GALLAGHER, J.**                                                                             May 1, 2024

**I.    OVERVIEW**

This is a breach of contract case over which the Court has diversity jurisdiction. Defendant sold its warehouse to Plaintiff but took its automation software—needed to run the warehouse's material handling equipment ("MHE")—with it. Plaintiffs claim they contracted with Defendants for that software and its removal breached the contract. Defendants counterclaim that by filing this lawsuit Plaintiffs breached the contract's covenant not to sue. For the reasons that follow, the Court grants Defendants' motion for summary judgment on Plaintiffs' claim of breach and grants Plaintiff's motion for partial summary judgment as to Defendants' counterclaim. The parties' cross-motions are denied otherwise.

## II. FACTUAL BACKGROUND

### A. Allegations

#### 1. The Sale Agreement

On November 6, 2019, Plaintiffs/Counterclaim Defendants Stony Battery RD Property Owner LLC and Stony Corp. Blvd. LLC (collectively, "Stony Battery")[1] entered into a Sale Agreement with QVC for the ownership of a warehouse. Defs.' Statement of Undisputed Facts in Supp. of Mot. for Summ. J. ("Defs.' SUF") at ¶ 5 (ECF No. 55-1). Both parties were represented by sophisticated legal counsel, *id.* at ¶¶ 6–7, but the sale was primarily negotiated between Jack Saadia and Robert Sandora on behalf of Plaintiffs and QVC, respectively, Pls.' Statement of Undisputed Material Facts ("Pls.' SUF") at ¶ 3 (ECF No. 54-2). The sale, at minimum, transferred ownership of an 884,000-square-foot warehouse facility, parking lot, and other improvements and appurtenances such as MHE, located at 1000 Stony Battery Road in Lancaster, Pennsylvania (the "Premises"). Defs.' SUF at ¶ 9.

After a series of amendments, a leaseback agreement was added so that upon closing, QVC would continue to operate within the warehouse for about nine months. Pls.' SUF at ¶ 11. At the end of the lease term, Plaintiffs would take possession of the property. *See id.* The Sale Agreement closed on March 26, 2021, Def.s' SUF at ¶ 32, at which point the lease began, *id.* at ¶ 37, and ran until December 21, 2021, Defs.' App. at A-0122.

---

[1] Plaintiffs and their affiliates' ownership structure is quite complicated. For the purposes of this opinion, it is not necessary to name the various non-parties and their relationship to Plaintiffs. Suffice it to say that Plaintiffs are part of a larger whole, and it is all run and overseen by Yakoub "Jack" Saadia.

2

### 2. The software

Modern warehouses, like the one in question, often include sophisticated MHE to handle the inventory stored there. The MHE, in turn, is made functional by even more sophisticated warehouse management software. Warehouse management software is not a one-size-fits-all market. Vendors often develop this tool to cater to a particular warehouse's needs. Before it vacated the premises, QVC used a warehouse management software known as WMS21. Plaintiffs, on the other hand, used a software known as WMi in at least one of its other warehouses. WMi is a product of Manhattan Associates, Inc. ("Manhattan").

Plaintiffs had hoped to use WMi at this warehouse, too, Pls.' Resp. in Opp'n to Def.'s SUF ("Pls.' Resp. SUF") at ¶ 67 (ECF No. 64-1), perhaps owing to what they perceived to be WMS21's "flaws and constraints," Defs.' SUF ¶¶ 58–61. As a fallback, Plaintiffs stated they were "open to running WMS21 if [Plaintiffs] can't integrate Manhattan quickly . . ." Pls.' SUF at ¶ 20. Indeed, three months after executing the Sale Agreement, citing delays with their plan to implement Manhattan's WMi, Plaintiffs approached QVC to inquire about a potential "contingency plan" that would involve Plaintiffs' licensing WMS21 from QVC. Defs.' SUF at ¶ 81. One month later, Plaintiffs followed up with Defendants regarding their July discussion about Plaintiffs "acquiring the Uniteq [*sic*] WM21 software." *Id.* at ¶ 83. And in August, Defendant provided a WMS21 licensing agreement to Plaintiff, which they rejected. *Id.* at ¶¶ 84–86, 93.

As the lease end date approached, Defendants began preparing for their departure. They sanitized the computers for confidential information and removed WMS21. *Id.* at ¶ 98. On December 31, 2021, the lease term ended, and Plaintiff took possession. *Id.* at ¶¶ 96–97. Without WMS21, Manhattan's WMi, or some other automation software, the MHE cannot, and did not,

operate. Pls.' SUF ¶¶ 23–29. Defendants claim, and Plaintiffs do not dispute, "that the physical MHE was properly maintained by QVC." Defs.' SUF ¶ 101.

### B. Procedural history

Plaintiffs filed this lawsuit on February 9, 2023, bringing one count of breach of contract, one count of conversion, and three quasi-contract counts. ECF No. 1. Following Defendants' April 28, 2023, answer, they filed a motion for judgment on the pleadings as to all counts except breach of contract. ECF No.s 16, 22. The Court granted Defendants' motion and discovery proceeded on Plaintiff's breach of contract claim—the complaint's sole remaining count. ECF No. 34.

## III. LEGAL STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is "genuine" when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Physicians Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615, 618 (3d Cir. 2020). And a fact is material if "it might affect the outcome of the suit under governing law." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The party moving for summary judgment must "identify[] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). In response, the nonmoving party must then "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could

reasonably find for the [nonmovant]." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015) (quoting *Anderson*, 477 U.S. at 252).

In applying this standard, the court must "construe the evidence in the light most favorable to the non-moving party." *Anderson*, 477 U.S. at 255. At the summary judgment stage, the court's role is not to weigh the evidence and determine the ultimate truth of the allegations. *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019). Instead, the court's task is to determine whether there remains a genuine issue of fact for trial. *Id.*

## IV. ANALYSIS

The parties' cross-motions for summary judgment each claim the contract is unambiguous. Although the Court grants in part each motion for summary judgment, we disagree with both parties that the contract is clear. As the Court explains below, the contract is ambiguous. Extrinsic evidence is admissible to interpret an ambiguous contract, but this is most commonly an exercise for the factfinder at trial. Courts may, however, interpret an ambiguous contract when the extrinsic evidence conclusively indicates its meaning. As explained below, extrinsic evidence in this case conclusively states that the parties did not contract for the automation software at issue.

Defendant's counterclaim is a much simpler issue in this case and is readily terminated by the text of the Sale Agreement's covenant not to sue.

### A. Plaintiffs' breach of contract claim

The theory of breach in this case is straightforward: Defendants breached the contract if, and only if, the automation software was included in the contract. This is a contract interpretation issue, but before addressing the meaning of the Sale Agreement we must delineate its four corners. Article 18.11 contains an integration clause that integrates the body of the Sale Agreement with its exhibits. ECF No. 11-1. The Court's analysis below will focus on the text of the Sale Agreement

as well as Exhibit A of the Bill of Sale because the Bill of Sale is Exhibit 10.1.2 of the Sale Agreement and states that "Seller hereby sells . . . to Purchaser all . . . the personal property described in Exhibit A attached to this Bill of Sale." *Id.*

"In construing a contract, the intention of the parties is paramount and the court will adopt an interpretation which under all circumstances ascribes the most reasonable, probable, and natural conduct of the parties, bearing in mind the objects manifestly to be accomplished." *Metzger v. Clifford Realty Corp.*, 476 A.2d 1, 5 (Pa. Super. Ct. 1984) (*citing Unit Vending Corp. v. Lacas*, 190 A.2d 298 (Pa. 1963). "Where the language of the written contract is ambiguous, extrinsic or parol evidence may be considered to determine the intent of the parties." *Id.* (*citing In re Herr's Estate*, 161 A.2d 32 (Pa. 1960)). Contractual language is ambiguous if the court cannot "determine its meaning without any guide other than knowledge of the simple facts on which, from the nature of the language in general, its meaning depends." *See Trombetta v. Raymond James Fin. Servs., Inc.*, 907 A.2d 550, 562 (Pa. 2006) (*citing Baney v. Eoute*, 784 A.2d 132, 136 (Pa. Super. Ct. 2001)).

### 1. The Sale Agreement is ambiguous

The Court agrees with Plaintiffs that "[t]he Bill of Sale contains numerous items that are unintelligible and/or could potentially include automation software . . ." and holds that this critical component of the contract renders it ambiguous. *See* Pls.' Resp. SUF at ¶ 21. The Court cannot determine the meaning of the Bill of Sale's relevant entries even after extensive briefing; and nor can Plaintiffs. "[T]here is no logical explanation as to how QVC sold Plaintiffs items such as 'labor,' '10,' '45,' or the myriad of progress payments contained in the Bill of [S]ale." Pls.' Mem. of L. in Opp'n to Def.'s Mot. for Summ. J. ("Pls.' Mem. Resp.") at 8 (ECF No. 64). In this case, the Bill of Sale has become something of a Rorschach inkblot test—the parties divine self-serving,

mutually exclusive meanings from its ambiguous entries. Plaintiffs interpret the ambiguity to mean that the automation software was included, while Defendants reach of the opposite conclusion.

In any case, from what little the Court can glean from this Bill of Sale, it at least seems to include some software that Plaintiff may not have had the right to sell. Pls.' Mem. of L. in Supp. of its Mot. for Partial Summ. J. ("Pls.' Mot.") at 5 (ECF No. 54-1). However, based on the Court's knowledge of the case, we find it unpersuasive that entries such as "MISSY SIZE 8 FULL FORM QVC-WMS0008-1005-WF" or "licensed Microsoft software" represent the critical, highly valuable, and specific automation software at issue. Plaintiffs seem to argue that any entry including "WMS" or "Microsoft" represents this software. Though we disagree, we cannot determine the meaning of these entries based on our "knowledge of the simple facts on which, from the nature of the language in general, its meaning depends. *Trombetta*, 907 A.2d at 562 (*citing Baney*, 784 A.2d at 136).[2]

By considering the Bill of Sale's genesis, it is easier to understand how it came to be unintelligible.[3] In the days leading up to closing, a QVC executive requested an automated report from an internal system that produced a list of all assets at the facility. Pls.' Resp. at 4; Defs.' Resp. SUF at ¶ 4. That executive did not closely review the report and assumed its accuracy instead. Defs.' Resp. SUF at ¶ 4. The record is unclear whether anyone else reviewed the report, even including Plaintiffs.

---

[2] Even if we held that the contract is not ambiguous, our conclusion would stand because Plaintiff has not pointed to a single entry that creates an issue of fact. There is no mention of WMS21 in the bill of sale. *See generally* 11-2. And on this record, no reasonable juror could conclude that "MISSY SIZE 8 FULL FORM QVC-WMS0008-1005-WF" represents the software, as Plaintiffs argue. Pls.' Letter (ECF No. 74).

[3] The Court notes the unfortunate irony of this case. A bill of sale is used to avoid disputes such as this by recording the transfer of ownership of an asset to a second party.

### 2. The extrinsic evidence is conclusive as to the contract's meaning

Trial courts may consider extrinsic evidence to determine the intent of the parties. *See Z & L Lumber Co. of Atlasburg v. Nordquist*, 502 A.2d 697, 701 (Pa. Super. Ct. 1985) (*citing Metzger*, 476 A.2d at 5)). Parol evidence of the parties' own interpretation of the contract, "as manifested by their conduct after formation, was entitled to great weight in construing the agreement." *Id.* (*citing Capitol Bus Co. v. Blue Bird Coach Lines, Inc.*, 478 F.2d 556, 560 (3d Cir. 1973)). This is especially true when the relevant conduct occurred before the controversy. *Id.* (*citing* 8 P.L.E. Contracts § 165 (1971)). Although the interpretation of an ambiguous contract with extrinsic evidence is usually an issue of fact, trial courts may take it upon themselves when the extrinsic evidence is conclusive as to meaning. *See Martin v. Monumental Life Ins. Co.*, 240 F.3d 223, 233 (3d Cir. 2001) (*citing In re Minnesota Power & Light Company*, 435 N.W.2d 550, 563 (Minn. Ct. App. 1989)).

Upon review of the extrinsic evidence in this case, the parties' intent as to the software at issue is clear: the automation software was not included in the Sale Agreement nor its attachments. The parties' conduct after formation, but before the controversy, leaves little doubt as to this conclusion. The structure of the contract, too, supports this conclusion.

At no point between the contract's formation and the end of the lease back period did the parties act as though this automation software was part of the integrated Sale Agreement. Plaintiffs did not even intend to use this software; they intended to use WMi, which was already in use at one of their other facilities. When it became clear to Plaintiffs that the alternative could not be up and running by the time they took possession, they inquired about using WMS21 only as a stop-gap measure and only via licensure for additional consideration.

In an email on February 3, 2021, three months after executing the Sale Agreement, Plaintiff's Supply Chain Officer stated that "we have already determined that Manhattan is our choice to move forward [with] . . ." Defs.' App. at A-0429 (filed under seal). The email goes on to state WMS21's "flaws and constraints of [WMS21] . . ." *Id.*; *see also id.* at A-0422–23. In fact, Plaintiff even requested Defendants' help in the bidding process with WMi. *See id.* Defendants moved forward with that plan as evidenced by emails on the day of closing, March 26, 2021. *See id.* at A-0424–25, 42.

Plaintiff's plan hit a snag when Manhattan's timeline for implementing their software extended beyond the lease term—but Plaintiff's response to that situation is especially telling. The timing issue became clear three months after closing. On July 21, 2021, Mr. Strobelt again contacted Defendants; this time to request, not demand, that Plaintiffs be allowed to "use WMS21 until Manhattan [*sic*] WMS project has completed?" Defs.' App. at A-0488. To wit, Mr. Strobelt wrote to Defendants and Mr. Saadia that "[o]ur strategy is to replace [WMS21] with Manhattan WMS at the Lancaster facility; however, Manhattan's timeline puts us into late lQTR 2021 for full operations of the building," so, "[a]s a contingency plan, we wanted to explore being able to utilize WMS21 by connecting our ERP and setting up our Brands within that system and see if we could be operational in 4QTR 2021." *Id.* The parties proceeded according to that plan over the course of summer. By August, Defendants had begun drafting a licensing agreement—an agreement wholly separate from the Sale Agreement—for a fee, Defs.' SUF at ¶ 84, and Plaintiff was evidently thrilled by this progress, Defs.' App. at A-0492 (email response of D. Strobelt responding "Fabulous! Thank you.").

These are not the actions of two parties who previously contracted for the sale of WMS21. It strains credulity to imagine that Plaintiffs, having executed a Sale Agreement for critical

9

software to run their warehouse just months earlier, were excited to pay for this same software a second time. Rather, it is clear to the Court that Plaintiffs executed the Sale Agreement fully expecting to have no need for WMS21 by the time they took possession. That changed in the intervening time between the Sale Agreement's execution and closing, so they entered months-long discussions with Defendants regarding WMS21. Even Plaintiff's own briefing cannot identify a single instance where they referenced the Sale Agreement while negotiating their use of WMS21.

The structure of the contract lends further support to the Court's conclusion. Software is mentioned nowhere in the body of the Sale Agreement. It references land and its improvements, appurtenances, personal property, and intangibles. ECF No. 11-1. Personal property is described under Article 2.4 to include "certain tangible property" as well as all items described in Exhibit 2.4, i.e., the Bill of Sale. As discussed above, Plaintiffs attempt to use the Bill of Sale's ambiguity to their advantage by claiming various vague lines are the software at issue. The Court has already discussed why it disagrees with these claims, but the structure of the contract adds to those reasons.

Software is intangible property. *See Lucker Mfg. v. Home Ins. Co.*, 23 F.3d 808, 818–19 (3d Cir. 1994) ("[T]angible property is property that can be felt or touched, or property capable of being possessed or realized."); U.C.C. § 9-102(a)(42) (defining "general intangible" to include software). It would make little sense for intangible assets to be included in the Bill of Sale when Article 2.5 covered "intangibles." ECF No. 11-1.[4]

What's more, the Bill of Sale—upon which Plaintiff's entire case depends upon—was not created until days after the contract's closing. Defs.' App. at A-0253. And unlike the body of the

---

[4] Additionally, no reasonable juror could conclude that sophisticated parties represented by counsel would only include this critically important software in the unintelligible Bill of Sale, which no one reviewed carefully.

10

Sale Agreement, the Bill of Sale was not negotiated by the parties and there is no indication that Plaintiffs even reviewed it. Plaintiffs argue, then, that although the body of the sale agreement—drafted with the aid of sophisticated counsel and subject to several amendments—contains no specific or structural reference to WMS21 and was signed before the Bill of Sale even existed, this Court should hold that the Sale Agreement unambiguously included the automation software. Of course, the Bill of Sale is integrated within the Sale Agreement, but the extrinsic evidence of this record leaves no reasonable interpretation in Plaintiffs' favor.

### B. Defendants' counterclaim for breach of covenant not to sue

Defendants counterclaim that this lawsuit itself is a breach of the Sale Agreement. Specifically, they claim that Plaintiffs violated the covenant not to sue under Article 9.3. ECF No. 11-1. Yet the text of Article 9.3 summarily defeats Defendants' argument: "Notwithstanding the foregoing, Purchaser does not waive its rights, if any, to recover from, and does not release or discharge or covenant not to sue Seller for any breach of Seller's obligations set forth in this Agreement." *Id.* Because Plaintiff's suit alleges that Defendants failed to provide all assets contracted for, the covenant not to sue has nothing to say about this action.

Setting aside that silver bullet in Article 9.3, the remainder of the text would not support the counter claim either:

> Without limiting the foregoing provisions, Purchaser . . . waives its right to recover from, and forever releases and discharges, and covenants not to sue[] Seller . . . with respect to any and all claims and causes of action . . . in contract, tort, or under statute, that may arise on account of or in any way be connected with the Assets including, without limitation, the physical, environmental and structural condition of the Premises or any law or regulation applicable thereto, including, without limitation, any claim or cause of action relating to the use, presence, discharge or release of Hazardous Materials on, under, in, above or about the Premises . . .

11

*Id.* The plain meaning of this text suggests that Article 9.3 concerned itself with the "as-is" nature of the agreement. While Plaintiffs are bound not to sue over the condition of the assets purchased, nothing in Article 9.3 prevents them from suing to enforce the transfer of assets allegedly contracted for.

## V. CONCLUSION

For the reasons set out in this memorandum, Plaintiffs' motion for partial summary judgment is granted as to Defendants' counterclaim but denied otherwise, and Defendants' motion for summary judgment is granted as to Count I of the complaint but denied otherwise. An appropriate order follows.

BY THE COURT:

*/s/ John M. Gallagher*
JOHN M. GALLAGHER
United States District Court Judge